

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:24-CR-80-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | |
| DERRICK CHAD ATKINSON | ) | |

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

2. The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

3. The DEA performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious order reports,

1

and bringing enforcement actions against registrants that failed to comply with the CSA. A distributor was not authorized under the CSA to distribute or dispense controlled substances unless it maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, research, or industrial channels." *See, e.g.*, 21 U.S.C. § 823(b)(1); *see also* 21 C.F.R. § 1301.71(a).

4.     In addition, the Attorney General's implementing regulations under the CSA required each distributor to design and operate a system to identify suspicious orders of controlled substances, and to report suspicious orders to DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

5.     The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—i.e., those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

6.     It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it

2

was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

7. Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

8. The Texas Administrative Code required that a "pharmacist shall make every reasonable effort to prevent inappropriate dispensing due to fraudulent, forged, invalid, or medically inappropriate prescriptions in violation of a pharmacist's corresponding responsibility." 22 Tex. Admin. Code § 291.29.

### The Greater Houston Area

9. The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

3

10.     The Houston area was a nationally recognized "hot zone" for pill-mill clinics and pharmacies involved in diverting certain controlled substances onto the black market.

## The Commonly Abused Prescription Drugs

11.     The following controlled substances in Schedule II were most often diverted onto the Houston area's black market:

   a. Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen. Hydrocodone 10-325 mg combination pills typically had a Houston area street value of between $5 to $10 per pill.

   b. Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available— and the one most in-demand on the Houston area's black market— contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on Houston area's black market. The street value of oxycodone's 30 mg and 10-325 mg pills was approximately $1 per milligram.

   c. Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

4

12.     In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

a. Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 or more per pill.

b. Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more.

c. Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so-called for their reputation on the black market of enhancing the high from the Commonly Abused Opioids.) (Collectively, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

### Diversion of Commonly Abused Prescription Drugs onto the Houston Area's Black Market

13.     One way that Commonly Abused Prescription Drugs were "diverted"—funneled onto the Houston area's black market—was through pill-mill pharmacies, which typically serviced only customers seeking to pay cash to acquire Commonly Abused Prescription Drugs for non-medical purposes. These pharmacies deployed different schemes designed to provide them access to some of the black-market profit generated by the Commonly Abused Prescription Drugs, while also helping the pharmacies to evade detection by law enforcement:

5

a. The "traditional" pill mill required individuals posing as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them.

b. "Counterfeit-prescription" operations typically involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs.

c. "Back door" operations—known to law enforcement as "ghosting" pharmacies— dispensed with doctors, patients, and prescriptions altogether, relying on established relationships with complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sell the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process with one or several more.

14. Houston area pill-mill pharmacies often exhibited numerous "red flags" of diversion well-known throughout the pharmaceutical industry, which were also enumerated by the Texas State Board of Pharmacy ("TSBP") in *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF….*, which TSBP regularly distributed to licensed pharmacies. These red flags included:

a. filling a reasonably discernible pattern of substantially identical prescriptions for the same controlled substances or combinations of controlled substances;

b. routinely filling prescriptions for known drugs of abuse, alone or in combination, including opioids, benzodiazepines (like alprazolam), and muscle relaxants;

c. routinely filling prescriptions for the highest strength and/or for large quantities of these drugs;

d. charging above-market rates and accepting mostly/only cash or credit (instead of insurance) for known drugs of abuse; and

e. routinely ordering controlled substances from more than one drug supplier.

6

15. Houston area pill mills commonly procured Commonly Abused Prescription Drugs from a collection of out-of-state "secondary" distributors—small-to-mid-size distributors that charged the pharmacies substantially over-market prices for the drugs. The pill-mill pharmacies readily paid the premium, because they still made large profits selling the drugs onto the black market for hundreds or even thousands of dollars in cash per bottle.

16. The secondary distributors typically implemented ordering restrictions like "caps" (limiting the number of Commonly Abused Prescription Drugs that a pharmacy could purchase per month) and "ratios" (requiring Houston area pharmacies to purchase a set number of non-controlled pills for every Commonly Abused Prescription Drug pill—even if the pharmacies purchased the same cheap generics, month after month, to meet the distributor's ratio requirement). The secondary distributors also typically documented perfunctory "due diligence," including questionnaires completed by the pharmacies or reports from third-party onsite inspections. These measures were not effective in preventing Houston area pill mills from obtaining the Commonly Abused Prescription Drugs from the secondary wholesalers.

17. The secondary distributors often adopted price lists, customer lists, and purported compliance measures for selling Commonly Abused Prescription Drugs to Houston area pharmacies from industry middlemen ("brokers") with established books of Houston area pharmacy business. The brokers were free agents—independent contractors who often represented several secondary distributors at

once. They claimed to be able to help secondary wholesalers "stay under the radar" of regulators and law enforcement. They knew which colors or brands of Commonly Abused Pharmaceutical Drugs the Houston area pharmacies preferred—for example, the blue-colored oxycodone 30 mg that gave that Commonly Abused Opioid pill its street name, the "blues." These preferences were not based on any legitimate medical purpose, but rather on street demand. In exchange for the access and profits the brokers provided, the secondary distributors paid the brokers sizeable commissions on the sales they facilitated.

## DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

18. Defendant **DERRICK CHAD ATKINSON** resided in Lumberton, in the Eastern District of North Carolina. From there, **DERRICK CHAD ATKINSON** helped Houston area pill-mill pharmacies buy Commonly Abused Prescription Drugs from willing secondary distributors, first as an independent contractor for Proven Rx Sales LLC ("Proven"), a purported pharmaceutical consulting company in Miami, Florida; and later, beginning in around 2017, directly as a sales representative for Wholesaler C.

19. Wholesaler C was a secondary distributor with its principal place of business in Miami, Florida, and its primary warehouse in North Carolina. Josh Weinstein held the title of President at Wholesaler C, and Persons A and B were 50/50 owners in Wholesaler C. From around 2017 through around 2022 Person B directly oversaw Wholesaler C's purported compliance person, and Person B

8

ultimately approved Wholesaler C's Houston area pharmacy customers' applications to purchase Commonly Abused Prescription Drugs and set their purchasing limits.

20. **DERRICK CHAD ATKINSON** served as Wholesaler C's direct sales representative for Houston area pharmacy accounts that purchased the Commonly Abused Prescription Drugs, including the following:

a. Ennis Street Pharmacy ("Ennis"), a "traditional" pill-mill pharmacy owned and operated by purported pharmacy consultant/headhunter Person E. In August 2020, several individuals affiliated with Ennis were arrested and charged with illegally distributing and dispensing Commonly Abused Prescription Drugs;

b. Keystone Pharmacy ("Keystone") was a Houston area pill-mill pharmacy owned and operated by Anthony Obute until his arrest, in late 2021, for dispensing Commonly Abused Prescription Drugs without any legitimate medical purpose;

c. The "Ross DTO Pharmacies," owned and/or operated by Dwain Ross, a high-ranking member of a drug trafficking organization (the "Ross DTO") that specialized in trafficking the Commonly Abused Prescription Drugs through several Houston area pill-mill pharmacies controlled by the Ross DTO. The Ross DTO operated the Ross DTO Pharmacies using a "traditional"/"back-door"-hybrid pill-mill scheme, requiring prescriptions from pill-mill clinics for Commonly Abused Opioids and selling Potentiators, in bulk, directly to drug dealers without prescriptions. Ross and other members of the Ross DTO ceased operating after they were arrested and charged with dispensing Commonly Abused Prescription Drugs without any legitimate medical purpose in around January 2023; and

d. The "Person D DTO Pharmacies," owned and/or operated by Person D, a high-ranking member of a drug trafficking organization (the "Person D DTO") that specialized in trafficking the Commonly Abused Prescription Drugs through Houston area pill-mill pharmacies controlled by the Person D DTO.

(Collectively, Ennis, Keystone, the Ross DTO Pharmacies, and the Person D DTO Pharmacies are the "Atkinson Pharmacies").

9

## WHOLESALER C'S SALES OF COMMONLY ABUSED PRESCRIPTION DRUGS TO HOUSTON AREA PILL-MILL PHARMACIES

21. In around 2017, **DERRICK CHAD ATKINSON** brought to Wholesaler C Proven's business model for selling Commonly Abused Prescription Drugs to Houston area independent pharmacies: essentially, selling the Commonly Abused Prescription Drugs at a large markup, while capping the pharmacy customers' monthly purchasing allocations; requiring the pharmacies to purchase non-controlled substances in a 4:1 ratio against the Commonly Abused Prescription Drugs the pharmacies purchased; and implementing purported compliance measures that mostly facilitated, instead of prevented, diversion.

22. For a brief period, **DERRICK CHAD ATKINSON** facilitated sales to Houston area pharmacies for both Wholesaler C and Proven. In 2018, when Proven's owner discovered that **DERRICK CHAD ATKINSON** was sourcing Commonly Abused Prescription Drugs from Wholesaler C to Proven's Houston-area pharmacies, Proven issued cease-and-desist letters to both **DERRICK CHAD ATKINSON** and Wholesaler C. But by that time, Wholesaler C had already discovered the large Houston area profit margins and Proven's model for exploiting them. So Proven and Wholesaler C settled on an agreement that allowed **DERRICK CHAD ATKINSON** to keep certain Proven customers with Wholesaler C, and that also allowed Proven to use Wholesaler C as a source of supply for Proven's customers with larger demands for the Commonly Abused Prescription Drugs than Proven's other secondary distributors would provide.

10

23. After **DERRICK CHAD ATKINSON**'s arrival, **DERRICK CHAD ATKINSON**, Weinstein, and Persons A, B, and C (a Wholesaler C compliance employee who reported to Person B) established prices for Commonly Abused Prescription Drugs that Wholesaler C would offer pharmacies in the Houston area, and they established the following practices for those customers:

   a. Person B, assisted by Person C, would review and approve applications to purchase controlled drugs;

   b. Houston area pharmacies would be required to purchase four non-controlled pills for every Commonly Abused Prescription Drug pill;

   c. Person B, assisted by Person C, would set limits on the number of Commonly Abused Prescription Drugs each Houston pharmacy could buy per month; and

   d. The Houston area pharmacy customers' purchasing limits and ratio requirements would be conveyed to them by **DERRICK CHAD ATKINSON** and/or other Wholesale C representatives.

24. Wholesaler C approved most Houston area pharmacy applications to purchase Commonly Abused Prescription Drugs, even though:

   a. The Houston area pharmacies commonly failed to complete portions of Wholesaler C's approximately 4-page "regulatory questionnaire";

   b. The Houston area pharmacies commonly reported in drug-usage reports ("DURs") they submitted with their applications that they dispensed few or even no controlled drugs other than the Commonly Abused Prescription Drugs;

   c. The Houston area pharmacies commonly reported in their application materials that they were already purchasing Commonly Abused Prescription Drugs from several other secondary distributors;

   d. The Houston area pharmacies commonly reported in their application materials that 70% or more of their customers used insurance to pay for prescriptions, even though insurance companies would not cover the prices Wholesaler C charged the pharmacies for the Commonly Abused Prescription Drugs even *before* the pharmacies marked them up further for sale to their customers.

11

e. The Houston area pharmacies commonly reported to Wholesaler C that they maintained hours of operation from 9 or 10 a.m. to 3 p.m.; and

f. The Houston area pharmacies commonly included photographs with their applications to purchase that depicted locations in strip malls, bars on the windows and doors, and/or nothing for sale in the areas accessible to customers—just pick-up and drop-off windows.

25. **DERRICK CHAD ATKINSON**, Weinstein, Persons A, B, and C, and others at Wholesaler C were also aware that many of Wholesaler C's Houston area customers had preferences for certain brands and/or colors of Commonly Abused Prescription Drugs—with those customers sometimes going so far as to refuse to purchase the "wrong" ones. For example, in an August 2017 email to **DERRICK CHAD ATKINSON** and the Wholesaler C email account nat.acct@████.com, a customer complained that "[y]ou sent me all 4 bottles of OXY 30 mg tab[let]s CAMBER Products. My patients/customers **do not accept** these YELLOW colored tab[let]s. I can not [sic] sell them, and that is why I requested specifically for **A[L]VOGEN OR MALLINKRODT** (emphasis in original)." Alvogen and Mallinckrodt pills were both blue, which was the preferred color on Houston's black market for oxycodone 30 mg. In a June 2018 email from Person B to **JOSHUA WEINSTEIN** and Person C, Person B asked of increasing requests by Houston area pharmacies for limit increases, "has something or someone in the market changed that has impacted their ability to get controls from other sources?" Person C responded, "The reason for the requests is because [**JOSHUA WEINSTEIN**] can get the brand Qualitest **and that is what these pharmacies want** (emphasis added)." The Houston area customers never expressed such preferences for the non-controlled

12

drugs they had to buy to purchase their limits of Commonly Abused Prescription Drugs from Wholesaler C.

26. Wholesaler C's employees came to understand that the controlled drugs the Houston area pharmacies were interested in purchasing were typically the Commonly Abused Prescription Drugs, and no others. For example, in the December 2020 email excerpted below, when **DERRICK CHAD ATKINSON** asked a Wholesaler C employee generally about controlled-drug "[a]llotments" for a new Houston area pharmacy, the Wholesaler C employee responded specifically about the Commonly Abused Prescription Drugs "[c]arisoprod[o]l [350 mg]," "[a]lprazolam 2 mg]," "[h]ydrocodone [10-325 mg]," and "[o]xycodone [30 mg]":

| From: | |
|---|---|
| Sent: | Thursday, December 10, 2020 1:11 PM |
| To: | ██████████ Joshua Weinstein; Chad Atkinson |
| Subject: | New Allotments for ██████ |

Carisoprodal  5,000
Alprazolam 5,000
Hydrocodone 4,000
Oxycodone 4,000

27. The focus on Commonly Abused Prescription Drugs in Wholesaler C's discussions with and about its Houston area pharmacy customers correlated with Wholesaler C's internal assessments of the company's profit margins. One such assessment, for Calendar Year 2021, concluded that Wholesaler C's margins on controlled substances it sold (almost all of which were Commonly Abused Prescription

13

Drugs sold into Houston) were more than ten times what the company made on sales of non-controlled substances:

## 2021

| 2021 (non) | 2021 (ctrl) | Total |
|---|---|---|
| $ 2,228,711.90 | $ 1,121,977.52 | $ 3,350,689.42 |
| $ 1,688,330.22 | $ 225,496.88 | $ 1,913,827.10 |
| $ 540,381.68 | $ 896,480.64 | $ 1,436,862.32 |
| 32% | 398% | 75% |

28. Wholesaler C's overall Schedule II dispensing after **DERRICK CHAD ATKINSON**'s arrival also reflected the company's focus on selling the Commonly Abused Opioids to its Houston area customers. From in or around January 2018 through in or around May 2023, Wholesaler C sold over 7.2 million Schedule II pills, nearly all of them Commonly Abused Opioids—just hydrocodone, oxycodone, and hydromorphone, in just one strength apiece:

**Commonly Abused Opioid Pills Wholesaler N Sold to Houston Area Pharmacies, 2017 Through End Q1 2023**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Q1 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| Hydrocodone 10-325 mg | 764,860 | 1,039,100 | 1,073,000 | 1,255,500 | 1,111,400 | 361,400 | 80,200 | 5,685,460 | 79% |
| Oxycodone 30 mg | 5,400 | 135,300 | 176,500 | 393,900 | 512,600 | 228,500 | 84,100 | 1,536,300 | 21% |
| Hydromorphone 8mg | | | | | 2,000 | | | 2,000 | 0% |
| Other | - | - | - | - | 5,480 | 7,400 | 4,700 | 17,580 | 0% |
| Total | 770,260 | 1,174,400 | 1,249,500 | 1,649,400 | 1,631,480 | 597,300 | 169,000 | 7,241,340 | 100% |

14

29. Further, although Wholesaler C was headquartered in Florida and operated distribution centers in Florida, North Carolina, Arizona, Maryland, and Tennessee, Wholesaler C supplied Commonly Abused Opioids almost exclusively to pharmacies located in the Houston area: during that timeframe, greater than 99% of the hydrocodone 10-325 mg and oxycodone 30 mg pills that Wholesaler C distributed to pharmacies anywhere in the United States went to the Houston area. At around $1 per milligram, the street value of the Commonly Abused Opioids Wholesaler C distributed into the Houston area during that timeframe was around $100 million.

30. During the same timeframe, Wholesaler C sold Houston area pharmacies millions of pills of the Potentiator carisoprodol 350 mg, hundreds of thousands of pills of the Potentiator alprazolam 2 mg, and over 1,300 gallons off the Potentiator promethazine with codeine syrup:

**Commonly Abused Controlled Substances (Schedule III-V) Wholesaler N Sold to Houston Area Pharmacies**

**2017 Through End Q1 2023**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Q1 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| Carisoprodol 350 mg pills | 647,000 | 1,063,000 | 643,000 | 843,200 | 864,000 | 387,000 | 64,000 | 4,511,200 | 71% |
| Alprazolam 2 mg pills | 14,500 | 68,000 | 67,000 | 209,000 | 261,000 | 134,000 | 30,500 | 784,000 | 12% |
| Promethazine w/ Codeine Syrup (measured in 5ml Dosage Units) | 3,311 | 51,368 | 34,434 | 256,744 | 485,906 | 136,224 | 45,976 | 1,014,963 | 16% |
| Total | 664,811 | 1,182,368 | 744,434 | 1,308,944 | 1,611,906 | 657,224 | 140,476 | 6,310,163 | 100% |

31. At around $5 per pill, the street value of the Potentiators alprazolam 2 mg and carisoprodol 350 mg that Wholesaler C distributed into the Houston area during that timeframe was around $26.5 million. At around $1,000 per pint, the

street value of the Potentiator promethazine with codeine that Wholesaler C distributed into the Houston area during that timeframe was around $10.5 million.

32. In addition, as the profit-margins table from 2021 above shows, Wholesaler C also made a profit on the non-controlled drugs it sold Houston area pharmacies that counted toward Wholesaler C's controlled-to-non-controlled-pill "ratio" requirement. For that purpose, Wholesaler C provided its Houston area pharmacy customers an ordering checklist with a small variety of non-controlled substances, which **DERRICK CHAD ATKINSON**, Weinstein, and/or others at Wholesaler C sometimes selected for the Houston area pharmacies. For example, in an August 2020 email to a Wholesaler C employee, Proven representative Cassandra Rivera wrote, "Sorry my dear was at Adventure Island…but its [a particular Houston area pharmacy]…**feel free to put the non[-controlled-pill order] together and lmk [let me know] the total** so they can send check [happy, arms-up, and folded-hands emojis] (emphasis added)." In a March 2021 email, a Wholesaler C employee emailed **DERRICK CHAD ATKINSON**, "Are the drams something you told [Procurement] to order or are those just **fake nons** (emphasis added)?"

### SALES OF COMMONLY ABUSED OPIOIDS TO THE ATKINSON PHARMACIES AND CREATIVE CARE

33. The following chart reflects the Commonly Abused Prescription Drugs that the Atkinson Pharmacies purchased through **DERRICK CHAD ATKINSON** from 2017 onward:

### Commonly Abused Opioids and Potentiators that the Atkinson Pharmacies Purchased from Wholesaler C

| | Hydrocodone 10-325 mg | Oxycodone 30 mg | Other Schedule II Controlled Substances | Potentiators Alprazolam 2 mg and Carisoprodo l 350 mg | Potentiator Promethazine with Codeine (measured in 5ml dosage units) | Other Schedule III-V Controlled Substances |
|---|---|---|---|---|---|---|
| Ennis Street Pharmacy | 369,100 | | | 294,700 | | 1,606 |
| Keystone Pharmacy | 344,500 | 21,200 | 18,820 | 303,500 | 10,406 | |
| Ross DTO Pharmacies | 12,000 | 9,500 | | 95,000 | 125,629 | 10 |
| Person D DTO Pharmacies | 37,500 | 59,000 | | 285,500 | 150,319 | |
| Total | 763,100 | 89,700 | 18,820 | 978,700 | 286,354 | 1,616 |

### Ennis

34. **DERRICK CHAD ATKINSON** was Wholesaler C's sales representative for Ennis, which operated as a "traditional" pill-mill pharmacy until it was shut down by federal agents executing search warrants and making arrests there in August 2020.

35. That did not come as a surprise to **DERRICK CHAD ATKINSON**, who knew that Ennis's computers had been "h[eld] hostage" by oversight authorities investigating Ennis the year before, as reflected in the following September 2019 text-message exchanges between **DERRICK CHAD ATKINSON** and Ennis's off-paper owner, Person E:

**September 13, 2019**

Atkinson: Any news yet?

Person E: Nothing yet...hopefully we will get cleared by Tuesday.

**September 23, 2019**

Atkinson: Hey buddy, how's everything? They still dragging their feet with your stuff?

17

| Person E: | Still waiting on our property to b[e] returned |
|---|---|
| Atkinson: | Gotcha |

**October 10, 2019**
| Atkinson: | They still holding your stuff hostage lol? |
|---|---|

**October 25, 2019**
| Atkinson: | Hey bud, any news? |
|---|---|
| Person E: | Yup....they're still holding our property |
| Atkinson: | [On the following day] Wow |

**November 15, 2019**
| Atkinson: | You guys still waiting on your computers back? |
|---|---|

36. **DERRICK CHAD ATKINSON** and Wholesaler C were not deterred. In December 2019, **DERRICK CHAD ATKINSON** text messaged Person E that Ennis was "[g]ood to go" to order controlled drugs again from Wholesaler C. In fact, Ennis's new purchasing limits for Commonly Abused Opioid hydrocodone 10-325 mg were 13,000 pills per month—more than Ennis had ever purchased from Wholesaler C in any single month. That month, Wholesaler C sold Ennis all 13,000 hydrocodone 10-325 mg pills. Ennis then purchased the maximum 13,000 pills from Wholesaler C in January 2020 and March 2020, before receiving another increase to 15,000 hydrocodone 10-325 mg pills monthly, which Ennis purchased in full until the federal warrant and arrests in August 2020 due to Ennis's continued unlawful sales of Commonly Abused Prescription Drugs.

37. **DERRICK CHAD ATKINSON** helped pad Ennis's non-controlled pill orders to meet Wholesaler C's ratio requirement. For example, in a January 21, 2020, text message exchange with Person E, Atkinson said, "I'm going to put some generics

18

together now. So if you have some stuff you need let me know real quick so I can add them." Person E replied, "Cool....I won't b[e] there today but I do know we need ibuprofen 800mg." Atkinson said, "Ok cool," and then, later, "Got the generic order to $819.53," to which Person E replied, "Perfect."

38.     From January 24, 2017, through August 13, 2020, all 369,100 Schedule II pills Wholesaler C sold Ennis were hydrocodone 10-325 mg.

## Keystone

39.     **DERRICK CHAD ATKINSON** also served as Wholesaler C's sales representative for Keystone, a Houston area "traditional" pill-mill pharmacy. On December 2, 2021, federal agents executed a search warrant at Keystone and they arrested its pharmacist-in-charge ("PIC") and owner, Anthony Obute, on charges of illegally selling Commonly Abused Opioids.

40.     Between May 2017 and late November 2021, Wholesaler C reported selling Keystone approximately 344,500 hydrocodone 10-325 mg pills and 21,200 oxycodone 30 mg pills, and no other Schedule II controlled drugs. Wholesaler C also regularly supplied Keystone with Potentiators like carisoprodol 350 mg and promethazine syrup with codeine, in large quantities, alongside the Commonly Abused Opioids.

41.     **DERRICK CHAD ATKINSON** frequently communicated with Anthony Obute about supplying Keystone with Commonly Abused Prescription Drugs from Wholesaler C, including in the following exchanges which show **DERRICK CHAD ATKINSON** helping Obute maximize limits:

19

| | |
|---|---|
| **April 23, 2021**: | [DERRICK CHAD ATKINSON checks on whether Obute is out of the country, and Obute confirms that to be the case.] |
| **Atkinson**: | [H]ad some items saved for you. Coming back soon or gone for a while?" |
| **Obute**: | soon. |
| **Atkinson**: | Ok I'll hold them for you for your May order, sound good? |
| **Atkinson**: | You know about when you'll be back? If it's by end of next week. I can ship so you don't lose allotments for April and will still have for May. |
| **Obute**: | No I will be back 1st week in May [and opening on May 10]. |
| **May 11, 2021** | |
| **Atkinson**: | Back open? |
| **Obute**: | [Indicates he will be back next week] |
| **May 17, 2021** | |
| **Atkinson**: | Is it ok if I send your April order back out today for you to receive this week? I had it processed for you a few weeks ago so you wouldn't lose a month of allotments. |
| **Obute**: | Sorry am not there yet, I will be back 2moro. Am looking to resume business b4 the end of the week. U can ship it on Wed or Thurs. Thanks. |
| **Atkinson**: | Ok I'll ship it Thursday. |
| **Obute**: | Ok good. |

42. Ultimately, Anthony Obute received Keystone's April allocation after May 21, meaning that despite opening for the month of May around May 20, 2021, Keystone got nearly two months' allotment of Commonly Abused Opioid pills from

20

Wholesaler C—at the time, 14,400 pills for the month of April, and 13,000 pills in the month of May—all of which were hydrocodone 10-325 mg and oxycodone 30 mg.

43. Pill colors were a regular topic of conversation between **DERRICK CHAD ATKINSON** and Anthony Obute: On March 17, 2020, Obute asked, "Do u have oxy 30mg in stock?" and **DERRICK CHAD ATKINSON** replied, "Yes but still the yellow pill," which Obute did not want to purchase. The same thing happened on April 23, 2020, when the following exchange occurred:

| | |
|---|---|
| **Obute**: | Hi Chad, just want to check if u have oxy in stock. |
| **Atkinson**: | Still just the camber brand |
| **Obute**: | What color are they? |
| **Atkinson**: | [Sends image of Camber yellow 30 mg pills.] |
| **Obute**: | Ok no |

44. When they learned of the December 2021 arrest of Obute, who was one of Wholesaler C's largest purchasers of Commonly Abused Prescription Drugs, **DERRICK CHAD ATKINSON** and Wholesaler C did not stop selling the same drugs, in the same patterns, to Wholesaler C's other Houston pill-mill pharmacy customers. They knew and understood that customers getting arrested for illegally selling the Commonly Abused Opioids was a cost of doing that business.

### Ross DTO Pharmacies

45. **DERRICK CHAD ATKINSON** also served as Wholesaler C's sales representative for the Ross DTO pharmacies.

46. In July 2020, **DERRICK CHAD ATKINSON** informed Dwain Ross that a new Ross DTO Pharmacy would have to purchase Commonly Abused Prescription Drugs in a ratio of "80/20 [per] pill. 4K non controls for every 1k controls." A subsequent text message from Atkinson contained an image with the pharmacy's monthly limits, which only included figures for Commonly Abused Prescription Drugs and no other drugs.

47. In May 2021, Dwain Ross text-messaged Atkinson with an instruction to "put a [sic] order in" for a different Ross DTO Pharmacy. The following month, using street slang for promethazine with codeine, Atkinson texted-messaged Ross asking, "Need some water for either place?" Ross responded, "Yes sir [ ]." Atkinson "liked" that response.

48. In January 2023, agents executed search warrants at Dwain Ross's residence and at a Ross DTO Pharmacy. Ross and several other Ross DTO members were arrested and charged with illegally selling the Commonly Abused Prescription Drugs that the Ross DTO acquired from Wholesaler C and other secondary distributors. Atkinson and Wholesaler C did not stop selling the same drugs, in the same patterns, to Wholesaler C's other Houston area pill-mill pharmacy customers.

### Person D DTO Pharmacies

49. **DERRICK CHAD ATKINSON** also served as Wholesaler C's sales representative for the Person D DTO Pharmacies.

50. In around 2022, Person B stepped back from compliance at Wholesaler C, and Person I was hired to perform that function. So-called compliance at

22

Wholesaler C was marginally better under Person I, as Person I would occasionally use a DEA lookup tool available to distributors and manufacturers that showed how many of a certain Schedule II pill other registrants distributed to a pharmacy.

51.     In an October 2022 text message exchange with Person D, **DERRICK CHAD ATKINSON** chided Person D for getting an increase in allocations for the Commonly Abused Prescription Drugs from other secondary distributors, instead of coming to **DERRICK CHAD ATKINSON** for that request. Person D responded that he'd gladly ask Wholesaler C for an increase, but **DERRICK CHAD ATKINSON** responded that "[t]hey (compliance) won't do it now when they see all those suppliers. [Wholesaler B], [E]med, and Salus. Only 1 reason why you sign up with those people. And compliance don't like it lol."

52.     **DERRICK CHAD ATKINSON** spoke too soon. After joking with Person D about the "1 reason" that Person D would order from all those secondary distributors, Wholesaler C sold Person D DTO Pharmacies at least approximately 4,000 hydrocodone 10-325 mg pills and 16,000 oxycodone 30 mg pills.

**COUNT ONE**
**Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances**
**(21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))**

53.     The General Allegations section of this Information is re-alleged and incorporated by reference as if fully set forth herein.

54.     From in or around mid-2017, and continuing through in or around late 2019, in the Eastern District of North Carolina, and elsewhere, the defendant,

**DERRICK CHAD ATKINSON,**

23

did knowingly and intentionally combine, conspire, confederate, and agree with Josh Weinstein, Person A, Person B, Person E, Anthony Obute, Dwain Ross, Person D, and others, known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **DERRICK CHAD ATKINSON** and his co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

55. The controlled substances involved in this conspiracy attributable to the defendant are mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances, as well as other controlled substances, in violation of Title 21, United States Code, Section 841(b)(1)(C).

### Purpose of the Conspiracy

56. It was the purpose and object of the conspiracy for the defendant, **DERRICK CHAD ATKINSON**, Josh Weinstein, Person A, Person B, Person E, Anthony Obute, Dwain Ross, Person D, and others, known and unknown to the United States Attorney, to unlawfully enrich themselves by, among other things: Distributing and causing to be distributed to Houston area pill-mill pharmacies controlled substances in a manner not authorized by law, including by knowing and intending that the pharmacies would and did distribute and dispense the drugs without valid prescriptions—i.e., without prescriptions issued in the usual course of a professional practice for a legitimate medical purpose.

24

<u>**Manner and Means of the Conspiracy**</u>

The manner and means by which the defendant, **DERRICK CHAD ATKINSON**, and his coconspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

57.     Beginning in or around 2018, and continuing through February 2022, the defendant, **DERRICK CHAD ATKINSON**, Josh Weinstein, Person A, Person B, Person E, Anthony Obute, Dwain Ross, Person D, and others, known and unknown to the United States Attorney, distributed Commonly Abused Prescription Drugs to Houston area pharmacies, knowing and intending that the Houston area pharmacies would distribute and dispense the controlled substances without a legitimate medical purpose and outside the usual course of professional practice.

All in violation of Title 21, United States Code, Section 846.

<u>**NOTICE OF CRIMINAL FORFEITURE**</u>
**(21 U.S.C. § 853)**

58.     The allegation contained in Count 1 of this Information is hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

59.     Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, the defendant,

**DERRICK CHAD ATKINSON,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, and intended to be used, in any manner or part, to commit, or to

25

facilitate the commission of, the offense.

60.     If any of the property described above, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    d.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).


This the 30th day of September, 2024.


MICHAEL F. EASLEY, JR.
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE


BY: N. TYLER LEMONS
ASSISTANT UNITED STATES ATTORNEY
CRIMINAL DIVISION

26